UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| FISCAL OPERATIONS, INC. and CALVIN GRIGSBY, ) ) ) ) Plaintiffs, ) v. ) ) MIAMI-DADE COUNTY, FLORIDA, ALEX ) PENELAS, STEVEN B. BASS, KATHY JACKSON, ) MIRIAM ALONSO, and DELOITTE & TOUCHE, ) LLP, ) ) ) Defendants. ) ) | Case No. 01-4798 |

### PLAINTIFFS FISCAL OPERATIONS AND CALVIN GRIGSBY'S OPPOSITION TO DELOITTE'S MOTION FOR ATTORNEY'S FEES

Plaintiffs Fiscal Operations, Inc. ("Fiscal") and Calvin Grigsby ("Grigsby") oppose Deloitte's motion for attorney's fees. For important policy reasons, the Supreme Court has set the bar very high for attorney fee motions by prevailing § 1983 defendants.[1] It is not sufficient that the complaint has been dismissed. The complaint also must have been "frivolous, unreasonable, or without foundation." See, *Hughes v. Rowe*, cited on page 4 of Deloitte's memorandum.

---

[1] See, e.g., *Christianburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 418-19 (1978): "[T]here are at least two strong equitable considerations" for imposing a more stringent standard of § 1988 fee eligibility on the prevailing *defendant* in a civil rights action. "First ... the [civil rights] plaintiff is the chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority,' ... [s]econd, when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law." Clearly, "these policy considerations which support the award of fees to a prevailing plaintiff are not present in the case of a prevailing defendant.'" Cf. *Aller v. New York Bd. of Elections*, 586 F.Supp. 603, 605 (S.D.N.Y. 1984): The "more stringent standard applicable to defendants is intended to ensure that plaintiffs with uncertain but arguably meritorious claims are not altogether deterred from initiating litigation by the threat of incurring onerous legal fees should their claims fail."

OPPOSITION TO DELOITTE'S
MOTION FOR ATTORNEY'S FEES
C-01-4798 Graham/Garber

1

As that standard has been applied by the Eleventh Circuit in the decisions which are most directly relevant to this action, Deloitte is not entitled to an award of attorney's fees because: (a) there are allegations in the complaint which, if believed and accepted, would support the causes of action (e.g., *Head v. Medford*, 62 F.3d 351, 355-56 (11th Cir. 1995)); (b) there is case law which supports Fiscal and Grigsby's positions (e.g., *Busby v. Orlando*, 931 F.2d 764, 789 (11th Cir. 1991)); and (c) the causes of action are "plausible" (e.g., *O'Neal v. DeKalb County*, 850 F.2d 653, 658 (11th Cir. 1988)).

Following is a count-by-count analysis showing why Deloitte is not entitled to attorney's fees. The issues are grouped into four categories: fabrication of evidence to instigate a capricious prosecution of Grigsby (Counts 3 and 4); taking Fiscal's business assets without just compensation (Count 2); confiscating Fiscal's twenty-year governmental franchise (Count 1); and common law fraud and malicious prosecution (Counts 6 and 7). The first three categories are the focus of the motion for attorney's fees filed by the County, the opposition to which is being served and filed concurrently with this one. Deloitte briefly mentions those three areas in three sentences on page 6 of its memorandum, but adds very little to the County's arguments, obviously relying on the County to carry the ball on the core issues. To avoid repetition, Fiscal and Grigsby will respond to Deloitte's three sentences primarily by adopting and incorporating by reference the facts and arguments they presented in their opposition to the County's motion, supplementing with additional comments where necessary. For convenience, a copy of the opposition to the County's motion is enclosed.

### I. FABRICATION OF EVIDENCE TO INSTIGATE A CAPRICIOUS PROSECUTION OF GRIGSBY (COUNTS 3 AND 4)

Deloitte's memorandum cites the Court's statement that "vague and conclusory allegations of fabricated evidence do not establish § 1983 liability" and the Court's conclusion that, as a matter of law, Grigsby cannot claim that Deloitte caused the prosecution. (Deloitte memorandum, p. 6). With respect to the "fabricated evidence" issue, Grigsby here adopts and incorporates by reference the facts and arguments on pages 2-14 of **PLAINTIFFS FISCAL OPERATIONS AND CALVIN GRIGSBY'S OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR ATTORNEY'S FEES** (hereafter, "Opposition to the County's Motion"), served and filed concurrently with this opposition.

On the "causation" issue, the Court explains its thinking on pages 18-19 of its Order granting Deloitte's motion to dismiss. First, the Court says Grigsby claims "that there is a causal connection between Deloitte's audit and financial restatements and Grigsby's subsequent prosecution ...." That is not a complete statement of Deloitte's role. Here are the allegations of the complaint describing what Deloitte did to assist in fabricating the evidence and setting up the prosecution.

[excerpts from paragraphs of the complaint]

> 40. During this same time period (early 1997), the Defendants enlisted Deloitte in their campaign against Fiscal and Grigsby. Deloitte, which had been auditing the Port's financial statements for approximately twelve years, actively worked with Jackson, Bass, Baum and others in pressuring Fiscal for extensive unnecessary documents. **Deloitte also began to confer with Jackson, Bass, Baum and others with respect to a change in Deloitte's accounting treatment of the Crane User Fees to support the Defendants' emerging plan to use allegedly improper expenditures of "Public Funds" as a pretext to seize Fiscal's business and to procure the indictment and seizure of Grigsby. To facilitate this scheme, Deloitte agreed to delay its audit for fiscal 1996 -- an audit which would normally have been completed in January of 1997 -- in order to co-ordinate its audit report with the special audit that Jackson was preparing at Penelas' direction and with Bass' assistance and input.** (emphasis added)

41. With its audit report for fiscal 1996 on hold, **Deloitte began to pressure the Controller of the Port, Richard Myers, to change the Port's own statement of revenues and expenses to treat the Crane User Fees paid to Fiscal by Fiscal's customers as "County Money" and "Public Funds."** Myers properly refused to make this change, after many years of reporting the Crane User Fees as the property of Fiscal, because there was no accounting justification for the change. In March 1997, Myers wrote in a file memorandum that "I've told them [Deloitte] I won't book this entry until I receive written documentation that shows objective criteria they used as a basis." Deloitte persisted in trying to force the change, but was never able to provide an accounting justification for the change. In September, 1997, Myers wrote in a memorandum to Blanca Padron of the County's Finance Department "we should require [Deloitte] to reverse their entry to 'gross up' the crane revenues and expenses unless they provide us with the support for the entry. I have made this request to Deloitte at least 10 times." (emphasis added)

42. Meanwhile, on May 21, 1997, Alonso, Chairman of the Maritime and Trade Committee of the Board, convened a special meeting of that committee. Alonso was the only Commissioner present. Also present were Bass, the County Manager, several assistants and clerks, and **three representatives of Deloitte**. This meeting was not an honest attempt to obtain information previously unknown in order to protect the public interest. **This meeting was another calculated step further setting the stage for action to terminate the franchise held by Fiscal, to terminate the implementing contract, to seize Fiscal's entire business just as it was about to become profitable, to make Grigsby a scapegoat in order to deflect attention away from the misbehavior of the County's own officials, and to procure an indictment and seizure of Grigsby.** (emphasis added)

51. On February 20, 1998, Deloitte issued its long-delayed audit report of the Port for fiscal 1996. With no supporting accounting justification, this audit report simply "restated" the Port's 1995 financial statements **solely to support the Defendants' theft of "Public Funds" assertion and the prosecution of Grigsby.** The restated audit report, contrary to Deloitte's audit reports for many years to the contrary, treated the Crane User Fees as "County Money." The audit report also changed, from $2,400 to in excess of $6 million, the amount of federal funds received by the Port in 1995, for **no reason other than to provide a jurisdictional prerequisite for the prosecution of Grigsby under 18 U.S.C. §666.** These same altered accounting treatments were applied to the 1996 financials of the Port as well. (emphasis added)

23. The **arbitrary reversal of the treatment of the Crane User Fees by Deloitte in its audit of the Port was particularly egregious and damaging to Fiscal and Grigsby. In its audit reports covering at least 1990 through 1995, Deloitte stated that** operating revenues of the Port included "[i]tems of income...relating to wharfage, dockage, rental, ground transportation, water and electric sources and miscellaneous port services are classified as operating

revenues..." **Crane User Fees were not included as items of revenue to the Port.** (emphasis added)

      25.    **If Deloitte had not capitulated** to the other Defendants' request to change its accounting treatment in this arbitrary manner, **the other Defendants likely would not have taken the predatory actions** which followed shortly thereafter, which depended entirely on the new fabricated assertion that the crane revenues belonged to the County. (emphasis added)

      52.    In the spring of 1998, armed with Jackson's internal audit report and Deloitte's now restated audits, the Defendants took matters into their own hands.

      73.    In this case, the Defendants, **with the assistance of Deloitte** and others, fabricated evidence to the effect that Grigsby had stolen "Public Funds" and used that fabricated evidence to deceive federal prosecutors into initiating a grand jury proceeding (where the jurors were similarly deceived) and a subsequent prosecution. (emphasis added)

[end of excerpts from paragraphs of the complaint]

Next, the Court states that the complaint does not allege that Deloitte gave its restatements to anyone other than the County Defendants. At this stage, of course, without the benefit of discovery, Grigsby does not know whether Deloitte communicated directly with the federal authorities. But Grigsby does not have to allege that Deloitte actually talked to the federal authorities to hold Deloitte liable as both a conspirator and a direct actor.

To establish the conspiracy, Grigsby has alleged the necessary "facts that suggest: 1) an agreement between [Deloitte] and [the County Defendants] to commit an illegal act [citation omitted] and 2) an actual deprivation of constitutional rights. [Citation omitted.]" *Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994). It is "unnecessary" to make allegations showing direct contact between Deloitte and others. See, e.g., *Jackson v. Faber*, 834 F.Supp. 471, 477 (D.Maine 1993) ("It is not necessary that Plaintiff allege that each coconspirator dealt directly with the state actor.") (citation omitted). "What Plaintiff must allege is 'that there was a single plan, the essential and general nature

of which [was] known to each person who [he seeks to hold] responsible for its consequences." Id. (citations omitted). Grigsby has made those allegations.

Nor does Deloitte's participation in the conspiracy have to be proven by direct evidence:

> "the agreement that rests at the heart of a conspiracy is seldom susceptible to direct proof: more often than not such an agreement must be inferred from all the circumstances." [Citation omitted.] Thus, the lack of factual allegations going directly to the existence of an agreement is not a basis for dismissal. [Citation omitted.] It is sufficient to survive a motion to dismiss that Plaintiff has made factual allegations which indicate with a reasonable degree of specificity who did what, when, and how these actions resulted in the deprivation of rights. [Citation omitted.]

*Jackson v. Faber* at 477.

Grigsby's allegations are also sufficient to hold Deloitte responsible as a direct actor. The Complaint alleges that Deloitte fabricated evidence with the intention that it be used to instigate a prosecution of Grigsby. Whether Deloitte personally delivered the information or sent it via a County messenger is immaterial. When the information was given to the County with the understanding that it was to be shared with the authorities, Deloitte was as much the provider of the information to the authorities as it would be if it had given the information to the postman in a letter addressed to the authorities.

Next the Court states (still on page 18 of the order) that the Complaint "fails to allege that Deloitte had any knowledge that any of the Defendants would communicate with federal prosecutors." That is also inaccurate. Here are the allegations of the complaint bearing specifically on Deloitte's knowledge about the plan to instigate a prosecution:

[excerpts from the complaint]

> 40. Deloitte also began to confer with Jackson, Bass, Baum and others with respect to a change in Deloitte's accounting treatment of the Crane User Fees to support the Defendants' emerging plan to use allegedly improper expenditures of "Public Funds" as a pretext to seize Fiscal's business and to **procure the indictment and seizure of Grigsby. To facilitate this scheme**, Deloitte agreed to delay its audit

for fiscal 1996 -- an audit which would normally have been completed in January of 1997 -- in order to co-ordinate its audit report with the special audit that Jackson was preparing at Penelas' direction and with Bass' assistance and input. (emphasis added)

41.   Deloitte began to pressure the Controller of the Port, Richard Myers, to change the Port's own statement of revenues and expenses to treat the Crane User Fees paid to Fiscal by Fiscal's customers as "County Money" and "Public Funds."

51.   With no supporting accounting justification this audit report simply "restated" the Port's 1995 financial statements **solely to support the Defendants' theft of "Public Funds" assertion and the prosecution of Grigsby.** The audit report also changed, from $2,400 to in excess of $6 million, the amount of federal funds received by the Port in 1995, for **no reason other than to provide a jurisdictional prerequisite for the prosecution of Grigsby under 18 U.S.C. §666.** (emphasis added)

57.   Bass and Jackson, acting in accordance with Penelas' wishes, fabricated the "Public Funds" description of Fiscal's revenues and, with the assistance of Baum, **persuaded Deloitte** to delay and then **improperly alter its audit reports to** (a) conform with the fabricated "Public Funds" concept and (b) **provide a jurisdictional basis for a federal prosecution of Grigsby.** (emphasis added)

87.   Deloitte knew that it had no accounting justification for reversing its accounting treatment of the crane revenues and **knew that it was "restating" its treatment at the request of the County to assist the County in taking these predatory actions against Fiscal and Grigsby.** (emphasis added)

89.   **On January 16, 1998, Jackson issued the special audit report** that Penelas had directed, accusing Fiscal of improper expenditures of "Public Funds" and **recommending that the County** take Fiscal's business and **refer the improper expenditures of "Public Funds" to criminal authorities.** On February 20, 1998, Deloitte, having waited to see Jackson's report so that it could assure that its supposedly independent audit report would be consistent, issued its long-delayed report **"restating" its 1995 findings to accomplish the objectives of the conspiracy, observing that the matter was being referred to authorities.** (emphasis added)

Finally, the Court states (on p. 19) that Grigsby has not alleged that the prosecution occurred as "the result of deception" of the federal authorities and the grand jury, thereby allowing the Court to conclude that the chain of causation would be broken by the intervening acts of the authorities and

the grand jury. Deception of the authorities establishes an exception to the general rule that the chain is broken. See, e.g., *Barts v. Joyner*, 865 F.2d 1187, 1195-96 (11th Cir. 1989) (emphasis added):

> The intervening acts of the prosecutor, grand jury, judge and jury -- assuming that these court officials acted without malice that caused them to abuse their powers -- each break the chain of causation ***unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant policeman.*** See, *Smiddy v. Varney*, 803 F.2d 1469 (9th Cir. 1986); *Duncan v. Nelson*, 466 F.2d 939 (7th Cir. 1972); *see also Hand v. Gary*, 838 F.2d 1420 (5th Cir. 1988) (in section 1983 action based on false arrest, grand jury or other independent intermediary breaks chain of causation ***unless defendant policeman misled intermediary***); ... cf *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) (decision of prosecutor to charge or grand jury to indict does not shield police officer who ***deliberately supplied misleading information***). ***Plaintiff introduced no evidence that the intervening acts of the prosecutor, grand jury, or jury were caused by any deception*** or undue pressure by Joyner or Blount. (emphasis added)

Grigsby has made the necessary allegations to establish the deception. See, again, Paragraphs 22, 73, and 75:

> 22. The Defendants falsely advised agents of the United States Attorney's Office that Grigsby had stolen "public funds," exploiting their exclusive and superior knowledge of the underlying relationship and arrangement between Grigsby and the County to hide the true nature and history of that relationship and arrangement from the federal agents. In effect, **the federal agents knew only the self-serving information that the Defendants chose to share and were not shown the pertinent facts which would expose the falsity of their "theft of public funds" charge.** (emphasis added)

> 73. The deliberate fabrication of incriminating evidence violates Constitutional rights, regardless of the prosecutor's ignorance of the falsified character of the evidence. In this case, the **Defendants, with the assistance of Deloitte and others, fabricated evidence to the effect that Grigsby had stolen "Public Funds" and used that fabricated evidence to deceive federal prosecutors into initiating a grand jury proceeding (where the jurors were similarly deceived) and a subsequent prosecution.** (emphasis added)

> 75. The Defendants, knowing that the "Public Funds" accusation which they made was a fabrication, **exploited their exclusive and superior knowledge of the underlying relationship and arrangement between Grigsby and the County to hide the pertinent facts from the authorities, selectively feeding in only that information which appeared to support the fabricated charge.** (emphasis added)

The appellate court will ultimately determine whether Grigsby has sufficiently alleged fabrication of evidence, Deloitte's knowing participation in the scheme, and deception of the federal authorities and the grand jury but, in the meantime, no one could conclude that Grigsby has not presented *any* facts and has *no* support in case law.

## II.   TAKING FISCAL'S BUSINESS ASSETS WITHOUT JUST COMPENSATION (COUNT 2)

Deloitte's memorandum reiterates the County's argument that Fiscal's taking claim is premature because an inverse condemnation action is available (at p. 6). Deloitte adds nothing to the County's argument and, in response, Fiscal here adopts and incorporates by reference the facts and arguments on pages 14-16 of the Opposition to the County's motion.

## III.   CONFISCATING FISCAL'S TWENTY-YEAR GOVERNMENTAL FRANCHISE (COUNT 1)

Deloitte's memorandum reiterates the County's argument that Fiscal has no property interest in the 1988 operating agreement. Again, Deloitte adds nothing to the County's argument and, in response, Fiscal here adopts and incorporates by reference the facts and arguments on pages 16-20 of the Opposition to the County's motion.

## IV.   COMMON LAW FRAUD AND MALICIOUS PROSECUTION (COUNTS 6 and 7)

Deloitte's memorandum observes that Grigsby does not allege that Deloitte communicated its "restated" position to *him* or that *he* relied on the new position. From this, Deloitte concludes that

he cannot establish a "threshold element" of his fraud claim. (at p. 6). But a misrepresentation to Grigsby is *not* an element of the claim in Count 6. Here is what the complaint alleges:

> 98.   Deloitte's reversal of its audit findings at the request of the other Defendants, with no accounting justification, was a deliberate false representation, which Deloitte made with knowledge of its falsity and with the intent of enabling the other Defendants to use the representation to deceive others (e.g., federal investigators) who would reasonably rely on the truth of the representation.
>
> 99.   This fraudulent misrepresentation by Deloitte was a material element of the Defendants' scheme to appropriate Fiscal's business and procure a capricious prosecution of Grigsby and was a proximate cause of the consequent injury to Fiscal and Grigsby. The other Defendants likely would not have proceeded with the confiscation of Fiscal's business and the instigation of Grigsby's prosecution if Deloitte had not agreed to reverse its longstanding audit treatment of the crane revenues.

These allegations state a cause of action for injurious falsehood. The elements of a claim for injurious falsehood are: (1) a falsehood, e.g., concerning title/ownership of property or the plaintiff's manner of business; (2) publication to a third person; (3) knowledge that the information would likely influence those in a position to injure the plaintiff; and (4) the falsehood played a material and substantial part in inducing others to act in a manner injurious to the plaintiff. See *Salit v. Ruden, McClosky, Smith, Schuster*, 742 So.2d 381, 387 n.3 and 338 (Fla. 4th DCA. 1999) (explaining that the tort of injurious falsehood is most properly analogized to tortious interference or to fraud). Both this tort and tortious interference with contract "share a common legal basis; both involve intentional interference with another's economic relations." *Procacci v. Zacco*, 402 So.2d 425, 426 (Fla. 4th DCA 1981) (citations omitted). Cf. *Old Plantation Corp. v. Maule Industries*, 68 So.2d 180, 181 (Fla. 1953) (*en banc*) (approving the following definition of slander of title: "a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, or of some right of his, causing him special damage").

The Florida Supreme Court has adopted sections 624-626 of the Restatement of Torts as the "law applicable to the tort of injurious falsehood." *Salit at* 387 & n.3 (citations omitted) (fully quoting the Restatement). This formulation does not require intent or fraud, but only publication of false and disparaging information concerning someone's real, personal or intangible property or manner of conducting business to a third person, even if the information was not known to be false. As of the *Salit* opinion, the Florida Supreme Court had *not* adopted section 623A of the Second Restatement, which requires both intent to harm and knowledge or reckless disregard of the statement's falsity. *Salit* at 387 & n.3. See also *Wells v. Oceanage Ass'n, Inc.*, 755 So.2d 185, 185 (Fla. 4th DCA 2000) (court appears to hold that allegation "with knowledge of its falsity" was "superfluous to a slander of title claim").

Deloitte delivered knowingly false information to the County for the express purpose that it be delivered in turn to the authorities to induce a prosecution of Grigsby (We do not presently know whether Deloitte spoke directly to the authorities.), meeting the first three elements of injurious falsehood. Deloitte knew the authorities would act on this information to Grigsby's injury, and the authorities did so act, no doubt influenced heavily by the legitimacy conferred by a certified audit report from a prestigious accounting firm. Even the County would not have had the gall to misrepresent the crane user revenues and commit further acts if they were not able to count on changing Deloitte's statements. This satisfies the fourth element. Special damages include attorneys' fees, loss of business and goodwill throughout the world.

Deloitte will presumably debate these points at the appeal level but, in the meantime, one could not say that Grigsby has *no* facts and *no* law to support his position.

With respect to Count 7, malicious prosecution, Deloitte and the Court appear to concede that the complaint states the basic elements of a malicious prosecution claim. Deloitte's memorandum

offers only a factual defense: Grigsby makes "no allegation that Deloitte transmitted any information to anyone other than the Port, its client [i.e., the other defendants] ... [and] fail[s] to allege that Deloitte had any knowledge that any of the Defendants would communicate with federal prosecutors." (Deloitte's memorandum, p. 6, citing the Court's Order granting Deloitte's motion to dismiss at p. 24.)

This flatly ignores Paragraphs 40, 41, 42, 51, 57, 73, 87, and 89 of the Complaint, discussed above on pages 3-7.

## THE FEES AND COSTS SUBMITTED BY DELOITTE WILL BE ANALYZED SEPARATELY, IF NECESSARY

The parties have agreed to bifurcate the legal determination whether Deloitte is entitled to fees (discussed in this opposition memorandum) from the separate factual determination as to the reasonableness of the fees and costs Deloitte has submitted and to address the latter only if the Court determines that Deloitte is entitled to fees. See **PLAINTIFFS' UNOPPOSED MOTION TO BIFURCATE LEGAL DETERMINATION OF DELOITTE'S ENTITLEMENT TO FEES FROM FACTUAL DETERMINATION OF QUANTIFICATION OF FEES AND COSTS**, served and filed concurrently with this oppsition.

## CONCLUSION

Like the County, Deloitte has used the terminology of the governing Supreme Court cases ("frivolous, unreasonable, without foundation") but has ignored most the facts of this case and the specific legal principles which govern a case of this type. Under these circumstances, Deloitte is not entitled to collect attorney's fees.

Respectfully submitted,

*/s/ William P. Tedards, Jr.*

William P. Tedards, Jr.
1101 30th St. N.W., Suite 500
Washington, D.C. 20007
TEL:   202 797-9135
FAX:   202 797-9139

Larry A. Stumpf
Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Boulevard, Suite 1300
Miami, FL 33131
TEL:   305 371-6421
FAX:   305 371-6322

James K. Green
James K. Green, P.A. Lawyers
Florida Bar #229466
Esperante - Suite 1630
222 Lakeview Avenue
West Palm Beach, FL 33401
TEL:   561 659-2029
FAX:   561 655-1357

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to Lee Kraftchick, Esq., Assistant County Attorney, DADE COUNTY ATTORNEY'S OFFICE, 111 N.W. 1st Street, Suite 2810, Miami, FL 33128; and Joel S. Perwin, Esq., PODHURST ORSECK, *et al.*, City National Bank Building, Suite 800, 25 West Flagler Street, Miami, FL 33130 by Federal Express, this 16th day of June, 2003.

William P. Tedards, Jr.